1  MICHAEL A. SWEET (SBN 184345)
   msweet@foxrothschild.com
2  JACK PRAETZELLIS (SBN 267765)
   jpraetzellis@foxrothschild.com
3  NOAH THOMAS (SBN 358134)
   nthomas@foxrothschild.com
4  **FOX ROTHSCHILD LLP**
   345 California Street, Suite 2200
5  San Francisco, California 94104
   Telephone:    (415) 364-5540
6  Facsimile:    (415) 391-4436
7  *Attorneys for Anvil Builders, Inc.*

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SANTA ROSA DIVISION

11

12  In re:                              Case No. 25-10088 (WJL)

13  KINGSBOROUGH ATLAS TREE            Chapter 11
    SURGERY, INC.
14                                     **CREDITOR ANVIL BUILDERS, INC.'S**
15                     Debtor.         **OBJECTION TO APPROVAL OF**
                                       **DISCLOSURE STATEMENT**
16
                                       **Hearing Information**
17                                     Date:      August 5, 2025
                                       Time:      9:30 a.m.
18                                     Location:  1300 Clay Steet, Courtroom 220
19                                                Oakland, California
20

21

22

23

24

25

26

27

28

173750585.6

# **TABLE OF CONTENTS**

I.      Introduction ................................................................................................................... 1

II.     Factual Background ........................................................................................................ 3

        A.      General Background ............................................................................................ 3

        B.      The Debtor's Business Has Never Operated Postpetition—It Plans to Liquidate
                Assets to Pay Unsecured Creditors a Fractional Distribution—Though Equity
                Remains Unimpaired. ......................................................................................... 3

        C.      The Debtor Does Not Intend to Pursue Any Claims Against Its Insiders Despite
                Their Multiple Roles and Outstanding Obligations to the Debtor. .......................... 4

        D.      The Debtor's Insiders Have Already Proved Dubious Fiduciaries by Failing to
                Disclose Compensation and Taking No Action to Adjudicate the $1.3 Million
                Held in a Segregated Account ............................................................................... 5

        E.      The Disclosure Statement Offers No Liquidation Analysis and the Facts of the
                Bankruptcy Case Offer Little Justification for Confirmation of a Chapter 11 Plan. 6

III.    Legal Argument .............................................................................................................. 7

        A.      The Disclosure Statement Cannot Be Approved Because It Does Not Provide
                Adequate Information. ......................................................................................... 7

                1.      The Disclosure Statement Does Not Include a Liquidation
                        Analysis .................................................................................................. 8

                2.      The Disclosure Statement Does Not Describe Key Issues Related
                        to the Debtor's Apparent Continued Corporate Existence
                        Postconfirmation. ................................................................................... 9

                3.      The Disclosure Statement Fails to Adequately Describe the Debtor's
                        Alleged Principal Asset—the Creditor Litigation—or Recovery and
                        Administrative Expense Risks Associated with the Same. ......................... 10

                4.      The Disclosure Statement Omits a Secured Creditor Readily
                        Identified on the Claims Register and a Public UCC Search .................... 11

                5.      The Disclosure Statement Does Not Disclose That the Plan
                        Provides for a Discharge of the Debtor on the Effective Date. ................. 12

                6.      The Disclosure Statement Fails to Describe, Quantify, or Reserve for
                        Postconfirmation Administrative Expenses Apparently Necessary to
                        Liquidate Assets and Administer Claims ................................................. 12

                7.      The Disclosure Statement Fails to Discuss Material Tax
                        Consequences to the Debtor .................................................................... 13

        B.      The Disclosure Statement Should Not Be Approved Because the Plan It
                Describes Is Patently Unconfirmable ..................................................................... 14

i

1.    The Plan Violates the Absolute Priority Rule by Permitting Insiders to Retain Their Equity Interests Despite Failing to Pay Higher Priority Claims in Full........................................................................................14

2.    The Plan Provides for a Discharge of a Liquidating Corporate Debtor.....15

3.    The Plan Provides for the Assumption of a Key Lease (to Store Equipment Intended to Be Sold to Satisfy Claims) That Is Already Rejected..............................................................................................16

4.    The Plan Is Not Feasible Because the Funding Sources Are Nothing More Than a Visionary Scheme. ...................................................16

IV.    CONCLUSION........................................................................................18

173750585.6

**Cases**

*In re Acequia, Inc.,*
    787 F.2d 1352 (9th Cir. 1984) ...........................................................................................17

*In re American Capital Equipment, LLC,*
    688 F.3d 145 (3d Cir. 2012)......................................................................................11, 14

*In re Arnold,*
    471 B.R. 578 (Bankr. C.D. Cal. 2012)................................................................................14

*Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St P'ship,*
    526 U.S. 434 (1999).............................................................................................................15

*In re Beyond.com Corp.,*
    289 B.R. 138 (Bankr. N.D. Cal. 2003) .........................................................................10, 12

*In re Brotby,*
    303 B.R. 177 (B.A.P. 9th Cir. 2003).............................................................................7, 16

*In re Cardinal Congregate I,*
    121 B.R. 760 (Bankr. S.D. Ohio 1990).............................................................................10

*In re Civitella,*
    14 B.R. 151 (Bankr. E.D. Pa. 1981) ...................................................................................8

*In re Crowthers McCall Pattern, Inc.,*
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) .................................................................................8

*In re Diversified Inv's Fund XVII,*
    91 B.R. 559 (Bankr. C.D. Cal. 1988)...................................................................................8

*In re Divine Ripe, LLC,*
    554 B.R. 395 (Bankr. S.D. Tex. 2016) ..............................................................................10

*In re EBP, Inc.,*
    172 B.R. 241 (Bankr. N.D. Ohio 1994) ...............................................................................8

*In re Egan,*
    33 B.R. 672 (Bankr. N.D. Ill. 1983) ...............................................................................8, 9

*In re Future Energy Corp.,*
    83 B.R. 470 (Bankr. S.D. Oh. 1988).................................................................................12

*In re Great N.W. Recreation Center, Inc.,*
    74 B.R. 846 (Bankr. D. Mont. 1987) .................................................................................17

173750585.6

*In re Howard*,
212 B.R. 864 (Bankr. E.D. Tenn. 1997) ...................................................................... 17

*In re Immenhausen Corp.*,
172 B.R. 343 (Bankr. M.D. Fla. 1994) ....................................................................... 17

*In re Investors Florida Aggressive Growth Fund, Ltd.*,
168 B.R. 760 (Bankr. N.D. Fla. 1994) ....................................................................... 17

*In re Ligon*,
50 B.R. 127 (Bankr. M.D. Tenn. 1985) ......................................................................... 8

*In re Metrocraft Pub. Services, Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ............................................................................ 7

*In re Mickey's Enterprises, Inc.*,
165 B.R. 188 (Bankr. W.D. Tex. 1994) ...................................................................... 11

*In re Microwave Products of America, Inc.*,
100 B.R. 376 (Bankr. W.D. Tenn. 1989) ................................................................... 10

*In re Pac. Shores Dev., Inc.*,
2011 WL 778205 (Bankr. S.D. Cal. Feb. 25, 2011) ..................................................... 8

*In re Pecht*,
57 B.R. 137 (Bankr. E.D. Va. 1986) .......................................................................... 14

*In re Perez*,
30 F.3d 1209 (9th Cir. 1994) ..................................................................................... 15

*In re ReoStar Energy Corp.*,
2012 WL 1945801 (Bankr. N.D. Tex. 2012) ............................................................. 10

*In re Robert's Plumbing and Heating, LLC*,
2011 WL 2972092 (Bankr. D. Md. July 20, 2011) ..................................................... 10

*Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II) Cos. L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.)*,
632 F.3d 168 (5th Cir. 2011) ..................................................................................... 17

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988) .......................................................................... 8

*In re Silberkraus*,
253 B.R. 890 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003) ............ 14

*In re Sound Radio, Inc.*,
103 B.R. 521 (D.N.J. 1989) ....................................................................................... 17

iv

*Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*,
    779 F.2d 1456 (10th Cir. 1985) ........................................................................................... 17

*In re William F. Gable Co.*,
    10 B.R. 248 (Bankr. N.D. W. Va. 1981) ............................................................................... 12

*In re Zaruba*,
    384 B.R. 254 (Bankr. D. Alaska 2008) ................................................................................. 13

**Statutes**

11 U.S.C. § 365 ......................................................................................................................... 3, 5

11 U.S.C. § 365(d)(4)(A) ............................................................................................................. 16

11 U.S.C. § 365(d)(4)(A)(i) ........................................................................................................ 4, 5

11 U.S.C. § 365(d)(4)(B) ............................................................................................................. 16

11 U.S.C. § 1107 ............................................................................................................................ 3

11 U.S.C. § 1108 ............................................................................................................................ 3

11 U.S.C. § 1123(b)(2) ................................................................................................................. 16

11 U.S.C. § 1125 ...................................................................................................................... 2, 14

11 U.S.C. § 1125(a)(1) .............................................................................................................. 7, 13

11 U.S.C. § 1125(b) ....................................................................................................................... 7

11 U.S.C. § 1129(a)(1) ............................................................................................................ 15, 16

11 U.S.C. § 1129(a)(5)(A)(i) ......................................................................................................... 10

11 U.S.C. § 1129(a)(8) ................................................................................................................. 15

11 U.S.C. § 1129(a)(11) ........................................................................................................... 16, 17

11 U.S.C. § 1129(b)(1) ................................................................................................................. 15

11 U.S.C. § 1129(b)(2)(B) ............................................................................................................ 15

11 U.S.C. § 1141(d)(3)(A) ............................................................................................................ 15

11 U.S.C. § 1141(d)(3)(B) ............................................................................................................ 15

**Other Authorities**

Cal. Prac. Guide Bankruptcy Ch. 11-G .......................................................................................... 12

v

Hon. Alan M. Ahart, *California Practice Guide: Bankruptcy* ¶ 11:1067 (The Rutter
    Group 2025) .................................................................................................................13

173750585.6

## MEMORANDUM OF POINTS AND AUTHORITIES

Anvil Builders, Inc. ("Creditor"), a creditor in the above-captioned bankruptcy case (the "Bankruptcy Case") of Kingsborough Atlas Tree Surgery, Inc. (the "Debtor") filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),[1] hereby submits this objection (the "Objection") to approval of the *Disclosure Statement in Support of Debtor's Plan of Reorganization* [Docket No. 160] (the "Disclosure Statement") describing the *Debtor's Plan of Reorganization* [Docket No. 161] (the "Plan"). In support of the Objection, the Creditor refers to the Declaration of Jack Praetzellis ("Praetzellis Decl.") filed concurrently herewith, and respectfully states as follows:

## I.

## INTRODUCTION

The Debtor, through its insiders, is attempting to advance confirmation of a facially deficient Plan for a non-operating business. Even the Debtor admits in its Disclosure Statement that its proposal "is not a good deal different than what would occur in a Chapter 7 proceeding." Discl. Stmt. at 7. If that is the case, then why attempt to confirm the Plan? The Disclosure Statement barely attempts to answer this question, and, in so doing, does not offer creditors adequate information.

The Debtor's effort to obscure the real purpose of this Bankruptcy Case, through its thin Disclosure Statement, does little to hide the true driver of this case and attendant administrative costs. The Debtor's insiders are the sole beneficiaries of the Debtor's effort to confirm a Plan for this nonoperating business. Insiders achieve this through concerning Plan provisions and omissions:

- **Equity Is Artificially "Unimpaired."** The Debtor's insiders are treated as "unimpaired" and retain their equity interests despite clearly disclosing that unsecured creditors will not receive full payment on their claims.

- **Claims Against Equity Unadministered.** The Debtor's insiders owe a nearly $1 million loan that has not been paid, likely received prepetition payments left undisclosed in an incomplete statement of financial affairs, apparently continue to accrue "rent" obligations on a rejected lease, and are co-obligors on much of the Debtor's secured debt. Yet, the Debtor's Plan arguably does not preserve these claims, and certainly does not contemplate them as a source of payment to unsecured creditors or a basis to offset liabilities of the estate.

- **Conflicts of Interest.** The Debtor's insiders will remain individual co-plaintiffs (along

---

[1] Unless otherwise indicated herein, all references to § or Section refer to a section of the Bankruptcy Code.

1

with the Debtor) in litigation the Debtor claims will be the most significant source of recovery to unsecured creditors. However, the Disclosure Statement offers no discussion of the speculative nature of the claims, the administrative cost of pursuing them, or the potential that the Debtor's insiders may absorb the lion's share of any unlikely recovery.

Altogether, the Bankruptcy Case appears to be a thinly veiled effort for creditors to pay the administrative cost of a grudge match prosecuted by the Debtor's insiders for their own benefit.

The Debtor's insiders have already offered insights into their dubious ability to separate personal interest from fiduciary obligations to the estate. By way of example, prepetition the insiders held $1.3 million of funds in a personal account which the Debtor admits has a disputed ownership. The insiders offer no accounting why initial disclosures pegged this amount at $1.4 million, which were lowered to $1.3 million, and ultimately (in monthly operating reports) disclosed at less than $1.3 million. Moreover, during postpetition sales, the Debtor has failed to disclose hidden commissions paid for the sale of estate property despite deposition testimony that the Debtor's insiders knew of the commissions. The Debtor's conduct, and the insider's conflicting personal interests, hardly suggest the Plan will serve any constituency other than their own.

Indeed, these concerns are best highlighted by the opacity of the Disclosure Statement. Among other things, the Disclosure Statement includes no liquidation analysis—instead impermissibly relying on admitted and terse opinion of the benefits of chapter 11 over chapter 7. The Disclosure Statement offers no discussion of the purpose or administrative cost of the continued postpetition existence of the Debtor. Nor does the Disclosure Statement offer an evaluation of the status and potential risks and administrative costs associated with liquidating the Debtor's asserted claims against the Creditor (the principal source of recovery to unsecured creditors). The Disclosure Statement does not disclose multiple potential sources of recovery from insiders, including guaranty obligations, a nearly $1 million loan, and potential avoidance claims. And the Disclosure Statement simply omits treatment for secured claims easily identified from a public records search. The Disclosure Statement simply does not provide adequate information sufficient to satisfy the requirements of § 1125 and must be denied.

Moreover, the Plan described by the Disclosure Statement is patently unconfirmable on its face even if the Disclosure Statement were adequate (which it isn't). The Plan violates the absolute priority

173750585.6

rule by inexplicably permitting equity to retain its interests in the Debtor as "unimpaired" despite unsecured creditors' expected fractional recovery. The Plan is premised on speculative litigation recoveries more efficiently pursued by a chapter 7 trustee. The Plan also provides for an Effective Date discharge of the Debtor even though it is a liquidating plan. Additionally, the Debtor proposes to assume a lease (of property owned by its insiders) that is already rejected by operation of § 365. These infirmities, and others, preclude confirmation of the Plan even if it were appropriate to solicit votes based on the current form of the Disclosure Statement. As a result, the Disclosure Statement should not be approved because it describes a patently unconfirmable plan.

For the reasons set forth more fully below, the Creditor respectfully requests that the Court deny approval of the Disclosure Statement.

## II.

## FACTUAL BACKGROUND

### A. General Background

On February 20, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. *See* Docket No. 1. As of the date of this Objection, the Debtor remains in possession, pursuant to §§ 1107 and 1108.

As of the date of this Objection, the Office of the United States Trustee has not appointed an official committee of unsecured creditors or an examiner in this Bankruptcy Case.

### B. The Debtor's Business Has Never Operated Postpetition—It Plans to Liquidate Assets to Pay Unsecured Creditors a Fractional Distribution—Though Equity Remains Unimpaired.

The Debtor has admitted from the start that there is no business to save in this Bankruptcy Case. In its own words, the "Debtor is not currently an operating business." *See* Docket No. 44 (Debtor' Status Conf. Stmt. at 2). "This case is unusual in that payment of creditor claims will not come from the operation of the Debtor's business but are dependent upon (i) Debtor's liquidation of its heavy equipment and (ii) the outcome of the pending litigation against Anvil Builders." *Id.* at 4.

The Plan reflects exactly the Debtor's anticipated outcome: the Plan is premised solely upon the liquidation of scant unencumbered assets and speculative, early-stage litigation claims. Secured creditors that are included in the Plan are permitted to retain their lien on equipment held by the Debtor

3

until it is sold to satisfy the secured creditors' claims. *See, e.g.*, Plan, Art. II at 5. Unsecured creditors receive payment on their claims solely from the sale proceeds for unencumbered collateral and any recovery from litigation brought against the Creditor. *See id.*, at 10-11. Despite apparently conceding that unsecured creditors will not receive a 100% payment, the Plan provides that the Debtor's insiders will retain their equity interests and will be unimpaired. *See id.*, at 11.

## C. **The Debtor Does Not Intend to Pursue Any Claims Against Its Insiders Despite Their Multiple Roles and Outstanding Obligations to the Debtor.**

The Debtor's equity interest holders—Cindy Kingsborough and Richard Kingsborough (collectively, the "Kingsboroughs")—each own 50% of the outstanding equity securities of the Debtor and are the Debtor's Vice President and President, respectively. *See* Docket Nos. 7 (Equity Security Holder List); 27 (Stmt. of Fin. Affairs, ¶ 28 at 8). In addition to their role as equity holders, the Kingsboroughs wear just about every other possible hat in this Bankruptcy Case:

- **Landlords**. The Debtor asserts that is a tenant in a month-to-month lease for real property located at 6263 Sebastopol Avenue, Santa Rosa, CA for $11,000 per month to store the Debtor's equipment. *See* Docket No. 170 (Am. Sched. G, ¶ 2.3 at 1). However, this lease has been rejected by operation of § 365(d)(4)(A)(i), so it is unclear where the equipment is currently stored.

- **Constructive Trustee**. On the Petition Date, the Debtor asserted that between $1.3 million and $1.4 million of its funds were held in a "Redwood Credit Union Personal Checking Account held by Cindy & Richard Kingsborough." *See* Docket No. 170 (Am. Sched. A/B, ¶ 77 at 8) (prior schedules inexplicably listed the amount as $1.4 million which was reduced in subsequent amendments). Those funds now appear held in a debtor-in-possession account, though in a slightly smaller amount than scheduled in each iteration of the Debtor's Schedule A/B. *See* Docket No. 192 (May 2025 MOR, at ECF p. 9).

- **Borrowers**. The Debtor acknowledges that it has loaned $950,000 to the Kingsboroughs, but does not identify any further provisions of the purported loan. *See* Docket No. 170 (Am. Sched. A/B, ¶ 77 at 8). Apparently, the Kingsboroughs have not paid on the loan, as neither the statement of financial affairs nor the monthly operating reports reflect payments over the last year-and-a-half. *See, e.g.*, Docket No. 27 (Stmt. Fin. Affairs, ¶¶ 4, 30 at 2, 8) (listing no payments to insiders within the year prior to the bankruptcy case); Docket No. 192 (May 2025 MOR, at ECF p. 9) (listing no payments)

- **Guarantors**. The Kingsboroughs are liable as co-obligors on no fewer than ten obligations under which the Debtor is liable. *See* Docket No. 26 (Sched. H, at 1-2).

- **Postpetition Management**. The Plan provides that the Kingsboroughs will manage and implement the Plan in addition to retaining their equity in the Debtor postconfirmation. *See, e.g.*, Plan, § 2.13 at 11, § 4.2 at 12.

- **Co-Plaintiffs**. The Kingsboroughs are co-plaintiffs in litigation brought by the Debtor

4

against the Creditor and, if successful, seek a personal recovery against the Creditor. This litigation is scheduled as the Debtor's most significant asset and largest alleged source of recovery to unsecured creditors in the Plan. *See* Docket No. 170 (Am. Sched. A/B, ¶ 77 at 8); Plan, § 2.12 at 10-11.

While this amalgam of roles is not uncommon in a closely held company, it is notable that the Debtor does not identify any potential claims against its insiders as sources for recovery. The Debtor's statement of financial affairs does not identify *any* transfers to insiders despite the foregoing relationships. *See* Docket No. 27 (Stmt. Fin. Affairs, ¶¶ 4, 30 at 2, 8). Moreover, the Debtor does not appear to have performed an analysis of *any* prepetition transfers—its March 6, 2025 statement of financial affairs reports: "This information to be provided in an amendment to this Statement of Financial Affair when the information becomes available." *See id.* ¶ 13.1 at 5 (cleaned up). Yet, no amendment is filed as of the date of this Objection. Moreover, the Disclosure Statement does not identify any of these interrelationships or potential sources of recovery. And the Plan does not contemplate that the Kingsboroughs might be sources of recovery: loan repayments, avoidance claims, and setoff from payments of co-obligated debt are omitted. Indeed, despite specifically preserving claims against the Creditor, the Plan is silent on avoidance power or other claims that might be pursued against the Kingsboroughs.

D. **The Debtor's Insiders Have Already Proved Dubious Fiduciaries by Failing to Disclose Compensation and Taking No Action to Adjudicate the $1.3 Million Held in a Segregated Account.**

The Debtor's postpetition conduct in at least three key instances calls into question its insiders' ability to satisfy their fiduciary obligations to the estate. ***First***, the Debtor has permitted an apparently important lease—a month-to-month lease with its insiders for equipment storage facilities—to expire by operation of § 365 after failing to extend timely the rejection deadline. *See* Docket No. 170 (Am. Sched. G, ¶ 2.3 at 1). The lease was deemed rejected on June 20, 2025, *see* 11 U.S.C. § 365(d)(4)(A)(i), but the Debtor proposes to assume the lease in its Plan. *See* Plan, Art. X at 19.

***Second***, the Debtor originally asserted that it permitted its insiders to hold $1.4 million of disputed funds in their personal accounts prepetition. *See* Docket No. 26 (Sched. A/B at 8). A subsequent amendment lowered that amount to $1.3 million without explanation. *See* Docket No. 170 (Am. Sched. A/B, ¶ 77 at 8). And monthly operating reports suggest these numbers were made of

5

whole cloth—a money market account that was reported as holding $1.642 million in an initial monthly operating report was subsequently subdivided by postpetition distributions into a distinct $1.3 million account by postpetition transfers. *Compare* Docket No. 108 (Am. Feb. 2025 MOR, at ECF p. 14) (reflecting initial $1.642 balance and subsequent $1.467 million transfer to money market account on Dec. 5, 2024); *with* Docket No. 109 (Mar. 2025 MOR. At ECF pp. 11, 17) (reflecting further transfer of $1.3 million into new account on March 12, 2025).

*Third*, in deposition testimony of Todd Eisenhauer and Cindy Kingsborough describing the postpetition sales processes authorized by the Court, Mr. Eisenhauer admits that purchasers paid a commission of unknown amounts on the sales of estate assets to certain buyers. Praetzellis Decl. Ex. 1 (Todd Eisenhauer Deposition) at 53:10-54:1. Although the Debtor's insiders were aware of this commission, which depressed the sale value of estate assets,[2] the Debtor and its insiders did not disclose the commissions to the Court or creditors. *Id*., Ex. 2 (Cindy Kingsborough Deposition) at 42:5-8; *see also* Eisenhauer Deposition at 53:20-54:1; *see generally* Anvil's Supplemental Objection to JCC Transport Sale Motion filed July 22, 2025. The Debtor's postpetition conduct is at best unclear and incomplete, and, at worst, misleading to creditors.

**E.** **The Disclosure Statement Offers No Liquidation Analysis and the Facts of the Bankruptcy Case Offer Little Justification for Confirmation of a Chapter 11 Plan.**

The Debtor's eight-page Disclosure Statement is threadbare, to say the least. But, the absence of exposition is telling on a key point: the Debtor offers little to defend why the Bankruptcy Case should remain in chapter 11. Indeed, the Debtor acknowledges that "[w]hat the debtor is proposing is not a good deal different than what would occur in a Chapter 7 proceeding." Discl. Stmt. at 7. The Debtor solely contends that the retention of Grafe Auction Co. will limit the administrative cost of liquidating equipment to pay secured and (maybe) unsecured claims and points to an unidentified potential for delay in chapter 7. *See id.* However, Grafe Auction Co. is employed by the ***estate***, which permits continued retention post-conversion. Moreover, its rates appear to be higher than market, according to Mr. Eisenhauer. Eisenhauer Deposition at 62:7-21. Moreover, the Debtor's apparent reticence to bring likely meaningful claims (or simply try to recover its nearly $1 million loan) against

---

[2] *See* Eisenhauer Deposition at 62:22-63:3 (testifying that a high buyer's premium discourages buyers and a buyer's premium makes it more expensive for a buyer).

its insiders is given no airtime in the analysis. Certainly, it appears that there are no advantages to chapter 11, except that the Debtor's insiders will continue to incur administrative expenses to steer liquidation and litigation in a manner that favors their multitudinous interests rather than those of the estate.

As set forth below, the Disclosure Statement provides woefully inadequate disclosure and cannot be approved. Even if it did, the Plan is patently unconfirmable on its face and continued prosecution of its confirmation will result in needless administrative expense.

## III.

## LEGAL ARGUMENT

**A.** **The Disclosure Statement Cannot Be Approved Because It Does Not Provide Adequate Information.**

A plan proponent must distribute a written disclosure statement "approved, after notice and a hearing, by the court as containing adequate information." § 1125(b). Adequate information is "information of a kind, and in sufficient detail . . . , that would enable [a] hypothetical investor of the relevant class to make an informed judgment about the plan." § 1125(a)(1).

The type and amount of information required to meet this definition "is subjective and made on a case by case basis." *In re Brotby*, 303 B.R. 177, 193 (B.A.P. 9th Cir. 2003). When determining whether a disclosure statement contains adequate information, courts must consider "the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . ." § 1125(a)(1). However, courts have developed a non-exhaustive checklist of items "which may be mandatory, under the facts and circumstances of a particular case, to meet the statutory requirement of adequate information." *In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). These factors include the following:

(1)    the events which led to the filing of a bankruptcy petition;
(2)    a description of the available assets and their value;
(3)    the anticipated future of the company;
(4)    the source of information stated in the disclosure statement;
(5)    a disclaimer;
(6)    the present condition of the debtor while in Chapter 11;
(7)    the scheduled claims;
(8)    the estimated return to creditors under a Chapter 7 liquidation;
(9)    the accounting method utilized to produce financial information and the name of the

7

accountants responsible for such information;

(10)   the future management of the debtor;

(11)   the Chapter 11 plan or a summary thereof;

(12)   the estimated administrative expenses, including attorneys' and accountants' fees;

(13)   the collectibility of accounts receivable;

(14)   financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

(15)   information relevant to the risks posed to creditors under the plan;

(16)   the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

(17)   litigation likely to arise in a nonbankruptcy context;

(18)   tax attributes of the debtor; and

(19)   the relationship of the debtor with affiliates.

*Id.*; *see also In re Scioto Valley Mortg. Co*., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988); *In re Pac. Shores Dev., Inc.*, 2011 WL 778205 at *4-5 (Bankr. S.D. Cal. Feb. 25, 2011). Not all of these factors may be mandatory depending on the facts of any given case, and some situations may require information beyond the factors. As set forth below, the Disclosure Statement does not satisfy these requirements.

### 1. The Disclosure Statement Does Not Include a Liquidation Analysis.

"[I]n order to provide adequate information, the disclosure statement must contain a liquidation analysis which compares the proposed plan of reorganization with a Chapter 7 liquidation." *In re Diversified Inv's Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988); *see also In re EBP, Inc.*, 172 B.R. 241, 246 (Bankr. N.D. Ohio 1994) ("adequate information requires that a liquidation analysis be provided . . . enabl[ing] creditors to test the proposed plan"); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300-301 (Bankr. S.D.N.Y. 1990) ("Disclosure statements are required to contain liquidation analyses that enable creditors to make their own judgment as to whether a plan is in their best interests and to vote and object to a plan if they so desire").

Disclosure statements must contain assertions with factual support; opinions are insufficient. *See In re Egan*, 33 B.R. 672, 675 (Bankr. N.D. Ill. 1983) ("without factual support, statements of opinion or belief are entirely inappropriate in Disclosure Statements"); *In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) ("Conclusory allegations or opinions without supporting facts are generally not acceptable [in a disclosure statement]"). Where a disclosure statement contains only opinion in lieu of a fact-based plan alternative, courts have denied approval of the disclosure statement. See *In*

8

*re Civitella*, 14 B.R. 151, 153 (Bankr. E.D. Pa. 1981) ("an expression of opinion is not the proper content of a disclosure statement . . . . A factually based examination of alternative means of relief would be permissible in a disclosure statement" [denying approval of disclosure statement]).

The Debtor admits its analysis is premised solely on impermissible opinion. *See Egan*, 33 B.R. at 675. Specifically, the Debtor provides that:

> What the debtor is proposing is not a good deal different than what would occur in a Chapter 7 proceeding. However, **Debtor is of the opinion** that by utilizing the services of Grafe Auction Co., at what appear to be very favorable terms,[3] the unsecured creditors should realize a better return with payment considerably sooner than in a Chapter 7 case.

Discl. Stmt. at 7:3-7 (emphasis added). Moreover, this opinion inexplicably omits key considerations that might maximize value were the Debtor's insiders to be displaced: the potential recovery (or existence) of claims against the Debtor's insider on outstanding loan obligations and avoidance claims. Additionally, the Debtor's opinion does not evaluate the impact of the estate's continued retention of the auctioneer in chapter 7, or the propriety of doing so in any chapter proceeding with evidence that hidden commissions have been paid. *See* Eisenhauer Deposition at 53:10-54:1 (describing undisclosed buyer's premium); Kingsborough Deposition at 42:5-8 (Debtor knew of buyer's premium paid). Accordingly, the Debtor's opinion that the Plan "should realize a better return" than liquidation is insufficient to meet the requirement that a disclosure statement include a liquidation analysis.

### 2. The Disclosure Statement Does Not Describe Key Issues Related to the Debtor's Apparent Continued Corporate Existence Postconfirmation.

The Debtor's equity holders are treated as "unimpaired" under the Plan and will retain their equity interests in the Debtor. Notwithstanding their dubious right to remain unimpaired, the apparent continued corporate existence of the Debtor raises multiple questions left unanswered by the Disclosure Statement.

***First***, the Disclosure Statement and Plan provide that postconfirmation administration of the Plan will be carried out by the Kingsboroughs but do not identify the postconfirmation management

---

[3] *But see* Eisenhauer Deposition at 49:1-5, 62:7-21 (stating that Grafe's buyer's premium is higher than Ritchie Bros., "the biggest auction company in the world.").

of the Debtor. *See, e.g.*, *In re Divine Ripe*, *LLC*, 554 B.R. 395, 410 (Bankr. S.D. Tex. 2016) ("Debtor has failed to provide adequate information . . . [on] the implications of the planned future management of the Debtor"); *In re Microwave Products of America, Inc*., 100 B.R. 376 (Bankr. W.D. Tenn. 1989) (disclosure statement "does not set forth in sufficient detail the management of the reorganized debtor"); *In re ReoStar Energy Corp*., 2012 WL 1945801 at *3 (Bankr. N.D. Tex. 2012) (refusing to approve disclosure statement until it included "[i]nformation regarding each member of the reorganized Debtors' management and board of directors"); *In re Robert's Plumbing and Heating*, *LLC*, 2011 WL 2972092 at *7 (Bankr. D. Md. July 20, 2011) (same); *In re Beyond.com Corp*., 289 B.R. 138 (Bankr. N.D. Cal. 2003).

*Second*, the Disclosure Statement does not recognize that the Debtor is no longer operating—as disclosed in other filings in this Bankruptcy Case—and does not address the status or risks associated with administering key assets like the Creditor litigation or the $1.3 million segregated cash. *See* § 1129(a)(5)(A)(i); *see also In re Robert's Plumbing and Heating*, LLC, 2011 WL 2972092 at *6 (Bankr. D. Md. July 20, 2011) ("without [disclosure concerning postpetition operations], creditors will have no rational basis for measuring the quality of the reorganization process and whether the Debtor can live up to its post-confirmation projections").

*Third*, the Disclosure Statement does not address the purpose or viability of the continued existence of the Debtor postconfirmation, or the administrative costs of the Debtor's asset liquidation proposal. *See In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) (disclosure statements "should include a discussion of the anticipated future of the debtor's business . . . [a] detailed analysis of the projected income, expenses, and surplus funds available for satisfaction of claims and interest is appropriate.") *In re Divine Ripe, LLC*, 554 B.R. 395, 406 (Bankr. S.D. Tex. 2016) (holding that analysis of future operations is necessary to "analyze potential risks during the time Debtor will perform the terms of the Plan").

Each of the foregoing is sufficient, on its own, to deny approval of the Disclosure Statement.

3.     **The Disclosure Statement Fails to Adequately Describe the Debtor's Alleged Principal Asset—the Creditor Litigation—or Recovery and Administrative Expense Risks Associated with the Same.**

A disclosure statement must include "all litigation likely to arise in a non-bankruptcy context

. . . [and] bankruptcy-related litigation." *In re Mickey's Enterprises, Inc.*, 165 B.R. 188, 194 (Bankr. W.D. Tex. 1994). The Disclosure Statement briefly mentions its litigation against the Creditor (the "Litigation"), the recovery of which makes up approximately eighty-four percent (84%) of the Debtor's scheduled assets. *See* Plan at 6 ("Debtor scheduled $72,575,650 in assets of which $61,000,000 is the damage claim against Anvil"). However, the Disclosure Statement omits important details related to the Litigation necessary to creditors' informed understanding of the Plan.

The Kingsboroughs are co-plaintiffs in the Litigation and stand to recover in their individual capacities if successful. There is no discussion in the Disclosure Statement as to whether and how any recovery from the Litigation will be split among the plaintiffs, nor how litigation expenses are to be paid. Further, beyond a two-sentence explanation of the background of the Litigation and a list of the Debtor's causes of action against the Creditor in the Litigation, the Disclosure Statement contains no discussion regarding the anticipated plans for the Litigation nor any justification that the potential recovery from Anvil is anything but speculative. *See In re American Capital Equipment, LLC*, 688 F.3d 145, 164 (3d Cir. 2012) (a court may determine based at the disclosure statement stage that a plan is unconfirmable where "its success is entirely contingent on speculative future litigation"). Moreover, the Disclosure Statement does not disclose that the Debtor's special counsel is co-counsel with the Kingsboroughs, which raises the specter that the insider's litigation costs will be borne by the estate and creditors. *See* Adv. Proc. No. 25-AP-1008 at Dkt. No. 1 at 6 (showing co-plaintiff status and joint representation).

Given the importance of the Litigation to the future success of the Plan, creditors must be apprised of the details of the Litigation to make an informed judgment about the Plan.

### 4. The Disclosure Statement Omits a Secured Creditor Readily Identified on the Claims Register and a Public UCC Search.

The Plan does not treat certain secured claims asserted on the Debtor's Claims Register or identified in a public UCC search through the California Secretary of State website. And, the Disclosure Statement offers no discussion concerning these omissions.

The Plan and Disclosure Statement provide that "[t]he undisputed [secured] claims of Classes 1 – 10 will be paid in full" upon the planned sale of the Debtor's equipment. However, at least one

11

secured creditor is omitted from classification and treatment as a secured creditor. The Operating Engineers Health and Welfare Trust Fund, et al., filed a secured claim in the amount of $167,700.02 that is not treated by the Plan. *See* Claim No. 63-1. The claim appears to correlate to a UCC filing accessible through a public UCC search on the California Secretary of State's website. The omission of a material secured claim from the Plan and Disclosure Statement, without explanation, does not provide adequate information to creditors.

5. **The Disclosure Statement Does Not Disclose That the Plan Provides for a Discharge of the Debtor on the Effective Date.**

The Plan provides for the discharge of the Debtor, which is a dubious proposition in its own right, as discussed below. However, where a plan requests an early discharge upon confirmation, such a request must be included in the disclosure statement. G. Disclosure Statement for Chapter 11 Plan, Cal. Prac. Guide Bankruptcy Ch. 11-G ("If the plan specifies the debtor will receive a discharge upon plan confirmation, disclose that provision and specify the grounds therefor"). According to the Plan, "Confirmation shall be a discharge . . . of any and all debts of the Debtor that arose at any time before Confirmation." Plan, ¶¶ 9.3 – 9.4. The Disclosure Statement does not include adequate information because it does not address the discharge request at all.

6. **The Disclosure Statement Fails to Describe, Quantify, or Reserve for Postconfirmation Administrative Expenses Apparently Necessary to Liquidate Assets and Administer Claims.**

The Bankruptcy Code "mandates full disclosure of all payments for services, costs, and expenses in connection with the case and subjects the reasonableness of these payments to the scrutiny and approval of the court." *In re Beyond.com Corp.*, 289 B.R. at 144 (*citing In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Oh. 1988)). A disclosure statement must contain a detailed description of existing and anticipated administrative expenses, including "debtors' attorney's fees; unsecured creditors' committee's expenses; printing and mailing expenses for the plan; attorneys' fees as to future litigation; accounting fees for the necessary tax returns plus any other anticipated future costs of administration." *In re William F. Gable Co.*, 10 B.R. 248, 249 (Bankr. N.D. W. Va. 1981).

The Disclosure Statement only addresses payment of preconfirmation administrative expenses and (even then) still omits allowance and payment of professional fees accrued but not approved preconfirmation. *See* Discl. Stmt. at 4. The Disclosure Statement (and Plan) contains no discussion

12

regarding anticipated future administrative expenses deemed by the Debtor necessary: (i) to liquidate the principal alleged asset of the Debtor's estate (the Litigation) or retain other professionals (*see* Plan, § 4.13 at 15); to administer claims postconfirmation (*see id.*, § 5.4 at 16); (iii) to pay for tax services contemplated by the Plan (*see id.*, § 4.7 at 22); or (iv) to pay postconfirmation United States Trustee fees (*see id.*, § 4.15.1 at 15). These expenses are likely substantial and will materially dilute recoveries on the speculative litigation claims already proposed as the most meaningful source of creditor recovery. The failure to disclose these anticipated costs does not provide creditors adequate information.

7. **The Disclosure Statement Fails to Discuss Material Tax Consequences to the Debtor.**

The Plan proposes an Effective Date discharge of all liabilities against the Debtor and the Debtor's continued existence as a "Reorganized Debtor," but claims dubiously there will be no tax consequences to the Debtor. Transactions pursuant to a reorganization plan "may have material federal tax consequences for the reorganized debtor (e.g., asset sales . . . )." Hon. Alan M. Ahart, *California Practice Guide: Bankruptcy* ¶ 11:1067 (The Rutter Group 2025). Any such tax consequences are required by the Bankruptcy Code to be described in the disclosure statement. Bankruptcy Code § 1125(a)(1) ("'adequate information' . . . include[es] a discussion of the potential material Federal tax consequences of the plan to the debtor"). Moreover, a debtor must disclose the source of any opinion concerning a plan's tax consequences. *See In re Zaruba*, 384 B.R. 254, 256-57 (Bankr. D. Alaska 2008) ("the disclosure statement alleges: 'Debtors have been advised that there will be no adverse tax consequences as a result of the transactions proposed in this plan.' Creditors are left to guess who formulated this opinion . . . . It does not constitute an adequate discussion of the tax effects of the plan").

The Disclosure Statement informs creditors that "[t]here should not be any tax consequences to any class of creditors as a result of confirmation of the plan except those creditors who receive a distribution that may have previously written off the claim for tax purposes." Discl. Stmt. at 7. The Disclosure Statement contains no other discussion of the tax consequences of the Plan, including consequences to the Debtor as required by § 1125(a)(1). If neither the asset sales described in the

Disclosure Statement nor other aspects of the Plan will have material Federal tax consequences to the Debtor, the Disclosure Statement should so state. However, the assertion is dubious, particularly where the Debtor has elsewhere claimed that it has not evaluated its taxes as far back as 2023 and that asset sales may result in tax liability. *See, e.g.*, Docket No. 26 (Sched. A/B at 8) ("2023 – 2024 tax returns have not been generated and could possibility result in tax liability from sale of equipment"). Regardless, the source of the opinion must be identified with greater particularity to provide adequate information.

For the reasons set forth herein, the Disclosure Statement should not be approved because it does not contain adequate information to satisfy the Debtor's obligations under § 1125.

**B.** **The Disclosure Statement Should Not Be Approved Because the Plan It Describes Is Patently Unconfirmable.**

"[W]here a plan is on its face nonconfirmable, as a matter of law, it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan." *In re Arnold*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2012) (quoting *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000), *aff'd,* 336 F.3d 864 (9th Cir. 2003)); *see also* 7 Collier ¶ 1125.03[4] ("most courts will not approve a disclosure statement if the underlying plan is clearly unconfirmable on its face") (collecting cases); *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) ("a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable"). "Not only would allowing a nonconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate." *Arnold*, 471 B.R. at 586 (quoting *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986)). As discussed below, the Plan described in the Disclosure Statement is patently unconfirmable on numerous grounds. Approval of the Disclosure Statement must be denied for this reason.

**1.** **The Plan Violates the Absolute Priority Rule by Permitting Insiders to Retain Their Equity Interests Despite Failing to Pay Higher Priority Claims in Full.**

The absolute priority rule precludes an equity security holder from receiving or retaining any

14

property unless unsecured creditors are paid in full.[4]  *See* § 1129(b)(2)(B).  The absolute priority rule prohibits "the bankruptcy court from approving a plan that gives the holder of a claim ***anything at all*** unless all objecting classes senior to him have been paid in full."  *In re Perez*, 30 F.3d 1209, 1214 (9th Cir. 1994) (emphasis added).  The rule serves to address "the danger inherent in any reorganization plan . . . that the plan will simply turn out to be too good a deal for the debtor's owners."  *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St P'ship*, 526 U.S. 434, 444-45 (1999).  As set forth above, this Bankruptcy Case specifically highlights these concerns: the Debtor's insiders seek to retain their equity interests while admitting unsecured creditors will not be paid in full.  Specifically, even assuming substantial recovery on assets granted to unsecured creditors, the distribution to unsecured creditors will not be 100%.  *See* Plan, § 2.12 at 10-11.  Nevertheless, "Class 12 claimants shall retain their equity interest without modification" and "[t]his class is unimpaired under the Plan."  *Id.*, § 2.13 at 11.  On its face, the Plan violates the absolute priority rule by permitting equity to retain its interests while higher priority claims remain unpaid.  Accordingly, the Plan cannot be confirmed on its face.

### 2.    <u>The Plan Provides for a Discharge of a Liquidating Corporate Debtor.</u>

The Bankruptcy Code does not permit confirmation of a plan to discharge a liquidating debtor.  Specifically, "[t]he confirmation of a plan does not discharge a debtor if . . . the plan provides for the liquidation of all or substantially all of the property of the estate [or] the debtor does not engage in business after consummation of the plan."  § 1141(d)(3)(A), (B).  A plan is not permitted to contravene this section of the Bankruptcy Code.  *See* § 1129(a)(1) (providing that a plan must comply with applicable provisions of the Bankruptcy Code as a condition of confirmation).

The Plan purports to grant the Debtor a discharge on the Effective Date.  *See* Plan, § 9.3 at 18.  The Plan does contemplate the continued existence of the Debtor, though for unclear reasons beyond implementation of the Plan.  *See, e.g.*, *id.*, § 4.1 at 12.  However, the Debtor does not propose that it will operate postconfirmation, and, in fact, the Debtor has admitted that it has not operated at all postpetition.  *See* Docket No. 44 (Debtor' Status Conf. Stmt. at 2).  Moreover, the Debtor explicitly

---

[4] This rule will apply given that the Plan includes deemed rejecting classes that will require the Plan to proceed by "cramdown."  *See* § 1129(a)(8), 1129(b)(1).  Moreover, the Creditor will object to the Plan as drafted.

173750585.6

Case: 25-10088    Doc# 225    Filed: 07/22/25    Entered: 07/22/25 17:17:06    Page 22 of 26

proposes the liquidation of substantially all of its assets, including equipment and litigation claims, to satisfy the claims of creditors under the Plan. *See* Plan, § 2.12 at 10-11. Accordingly, the Debtor is not entitled to a discharge under the Bankruptcy Code and the Plan cannot be confirmed with the discharge provisions currently incorporated in the Plan.

**3.** **The Plan Provides for the Assumption of a Key Lease (to Store Equipment Intended to Be Sold to Satisfy Claims) That Is Already Rejected.**

The Bankruptcy Code permits a plan to include provisions for the assumption, rejection or assignment of any unexpired lease not previously rejected. *See* §§ 1123(b)(2), 1129(a)(1). The Plan provides for the assumption of a month-to-month lease of property owned by the Debtor's insiders, which the Debtor uses to store the equipment intended to be liquidated under the Plan. *See* Plan, Art. X at 19. However, this lease has already been rejected by operation of law. Section 365(d)(4)(A) automatically deems rejected an unexpired lease of nonresidential real property—and requires its surrender—upon the earlier of 120 days after the Petition Date or entry of a confirmation order. *See* § 365(d)(4)(A). The Debtor may extend this period only prior to the expiration of the 120-day period. *See* § 365(d)(4)(B). The 120-day period expired on June 20, 2025, and the Debtor had not assumed, rejected, or sought extension of the deadline by that date. Accordingly, by operation of law, the lease is deemed rejected and cannot be assumed through confirmation of the Plan.

**4.** **The Plan Is Not Feasible Because the Funding Sources Are Nothing More Than a Visionary Scheme.**

The Bankruptcy Code requires that a plan proponent advance a "feasible" plan and establish that:

> confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan

Bankruptcy Code § 1129(a)(11). This requirement usually encompasses two interrelated determinations—(i) a finding that the debtor will be able to make all payments under and comply with the provisions of the plan, and (ii) a finding that the plan provides reasonable assurances that the debtor will remain viable for a reasonable time. *Brotby*, 303 B.R. at 191 (providing that a court may confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need

16

for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."); *In re Acequia, Inc.*, 787 F.2d 1352, 1364 (9th Cir. 1984); *see also In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765 (Bankr. N.D. Fla. 1994) (rejecting visionary schemes promising creditors and equity holders more than the debtor can possibly attain and holding that "where the financial realities do not support the proposes plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied"); *In re Immenhausen Corp.*, 172 B.R. 343, 348-49 (Bankr. M.D. Fla. 1994) (requiring that the Court consider the "earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business" to make an affirmative finding that a plan is feasible); *see also Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II) Cos. L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168, 172–74 (5th Cir. 2011) (quoting § 1129(a)(11) ("[t]o obtain confirmation of its reorganization plan, a debtor must show by a preponderance of the evidence that its plan is feasible, which means that it is 'not likely to be followed by…liquidation, or the need for further financial reorganization'"); *Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.)*, 779 F.2d 1456, 1460 (10th Cir. 1985) (holding that § 1129(a)(11) prevents confirmation of visionary schemes which promise creditors more than the debtor can possibly attain after confirmation); *In re Howard*, 212 B.R. 864, 879-80 (Bankr. E.D. Tenn. 1997) (like Chapter 11 plan, Chapter 12 plan must be realistic, not mere wishful thinking; debtors must be able to do what they are proposing); *In re Sound Radio, Inc.*, 103 B.R. 521, 522 (D.N.J. 1989); *In re Great N.W. Recreation Center, Inc.*, 74 B.R. 846, 854-56 (Bankr. D. Mont. 1987).

The Debtor's Plan is not feasible because its two sources for funding are entirely illusory. The Debtor seeks to fund the Plan through a combination of: (i) unencumbered proceeds from the sale of equipment, to the extent available; and (ii) the proceeds of litigation commenced against the Creditor. However, the Debtor does not advance any analysis of the likelihood of recovery or the associated administrative expense. The Plan is little more than "wishful thinking" that presents a protracted pathway to almost certain default. As such, the Plan cannot be confirmed as feasible.

For the foregoing reasons, the Disclosure Statement should not be approved because it

describes a Plan that is patently unconfirmable.

**IV.**

**<u>CONCLUSION</u>**

For the foregoing reasons, the Creditor respectfully requests that the Court enter an order (i) disapproving the Disclosure Statement; and (ii) granting the Creditor such other and further relief as is just and appropriate under the circumstances.

Dated: July 22, 2025                                   **FOX ROTHSCHILD LLP**

                                                By:  */s/ Jack Praetzellis*
                                                     Jack Praetzellis
                                                     *Attorneys for Anvil Builders, Inc.*

173750585.6
Case: 25-10088    Doc# 225    Filed: 07/22/25    Entered: 07/22/25 17:17:06    Page 25 of 26

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 10250 Constellation Boulevard, Suite 900, Los Angeles, CA 90067.

A true and correct copy of the foregoing documents entitled: CREDITOR ANVIL BUILDERS, INC.'S OBJECTION TO APPROVAL OF DISCLOSURE STATEMENT will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.** **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On 7/22/25, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jamie P. Dreher    jdreher@downeybrand.com
- Michael C. Fallon    fallonmc@fallonlaw.net, manders@fallonlaw.net
- Michael C. Fallon    mcfallon@fallonlaw.net, manders@fallonlaw.net
- Alan W Forsley    alan.forsley@flpllp.com
- Gabriel P Herrera    gherrera@kmtg.com, bxiong@kmtg.com
- Paul Gregory Leahy    Paul.Leahy@usdoj.gov
- Matthew P. Minser    mminser@sjlawcorp.com
- Office of the U.S. Trustee / SR    USTPRegion17.SF.ECF@usdoj.gov
- Jack Praetzellis    jpraetzellis@foxrothschild.com, jack-praetzellis-1683@ecf.pacerpro.com
- Michael A. Sweet    msweet@foxrothschild.com, michael-sweet-6337@ecf.pacerpro.com
- Philip J. Terry    pjterry@cmprlaw.com, dhayes@cmprlaw.com
- Jennifer C. Wong    bknotice@mccarthyholthus.com, jwong@ecf.courtdrive.com

**2.** **SERVED BY UNITED STATES MAIL**: On  N/A, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge __will be completed__ no later than 24 hours after the document is filed.*

**3.** **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on N/A, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge __will be completed__ no later than 24 hours after the document is filed.*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 7/22/2025 | Kimberly Hoang | /s/ Kimberly Hoang |
| *Date* | *Printed Name* | *Signature* |