# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of June 5, 2023, is entered into among KINGSBOROUGH ATLAS TREE SURGERY, INC., a California corporation ("**Seller**"), RICHARD KINGSBOROUGH and CINDY KINGSBOROUGH (collectively, "**Shareholders**" and each individually, a "**Shareholder**") and ANVIL POWER, INC., a California corporation ("**Anvil Power**") and ANVIL EQUIPMENT COMPANY LP, a California limited partnership ("**Anvil Equipment**"). Seller and Shareholders are sometimes referred to in this Agreement as "**Seller Parties**" and each individually as a "**Seller Party**". Anvil Power and Anvil Equipment are sometimes referred to in this Agreement collectively as "**Buyers**" and individually as "**Buyer**". This Agreement is entered into under the following circumstances:

## RECITALS

A.      Seller is engaged in the business of residential, commercial, and governmental tree service (the "**Business**"). Shareholders own all of the outstanding capital stock of Seller.

B.      Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, certain of the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01    Purchase and Sale of Assets.**

(a)      <u>Sale to Anvil Power</u>. Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Anvil Power, and Anvil Power shall purchase from Seller, all of Seller's right, title, and interest in, to, and under the tangible and intangible assets, properties, and rights described below, wherever located (collectively, the "**Anvil Power Purchased Assets**"):

(i)      All agreements with Pacific Gas & Electric Co. ("**PG&E**"), and other agreements with customers to the extent that they are assignable (the "**Assigned Contracts**");

(ii)      All tradenames, trademarks, websites and business telephone numbers;

(iii)      All goodwill and going concern value;

1

(iv)     Insurance policies (general liability with fire exclusion and others) that are designated by Anvil Power in writing, if any, that satisfy PG&E's requirements (the "**Assigned Insurance Policies**"); and

(b)     All  small tools etc. (chainsaws, safety gear, vests etc.).

(c)     <u>Sale to Anvil Equipment</u>. Subject to the terms and conditions set forth herein, at the Closing initially, and after the Closing at any time designated by Anvil Equipment within thirty (30) days after the date of this Agreement, Seller shall sell, convey, assign, transfer, and deliver to Anvil Equipment, and Anvil Equipment shall purchase from Seller, all of Seller's right, title, and interest in, to, and machinery, tools, vehicles, excluding personal vehicles, office equipment, and other tangible personal property designated by written notice from Anvil Equipment to Seller, wherever located, together with all of Seller's rights under warranties, indemnities, and similar rights against third parties relating to any property described in this paragraph (collectively, the "**Anvil Equipment Purchased Assets**").

**Section 1.02     Assumed Liabilities.**

(a)     Subject to the terms and conditions set forth herein, Anvil Power shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "**Anvil Power Assumed Liabilities**"), and no other Liabilities:

(i)     all Liabilities in respect of the Assigned Contracts and the Assigned Insurance Policies, but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing; and

(ii)     Accrued Paid Time Off (PTO) and vacation liabilities with respect to Seller's employees who are hired by Buyer, up to an aggregate amount of $200,000 (the "**Accrued PTO Liability**").

For purposes of this Agreement, "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)     Notwithstanding any provision in this Agreement to the contrary, Buyers shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

**Section 1.03   Purchase Price.**

(a)      The aggregate purchase price for the Anvil Power Purchased Assets (the "**Anvil Power Purchase Price**") shall be (i) $690,000 (the "**Anvil Power Fixed Component**"), (ii) the assumption of the Anvil Power Assumed Liabilities, and (iii) a percentage of the Net Profit from the Assigned Contracts during the five (5) Years (as defined below) after the Closing, determined as follows:

| Year | Profit Percentage |
|---|---|
| 1 and 2 | 35% |
| 3 | 25% |
| 4 | 20% |
| 5 | 15% |

(b)      "**Net Profit**" shall equal revenue minus expenses.  Expenses shall include:

(i)      All job expenses directly related to the Assigned Contracts;

(ii)      All labor costs (direct and management), including all taxes, benefits, 401K contributions and costs, bonuses, and insurance premiums prorated for services provided under the Assigned Contracts;

(iii)      All equipment necessary for the Assigned Contracts, to be charged to jobs at Anvil Power's internal rates (lower than market rates); and

(iv)      Anvil Power's actual overhead of 4% to 9% for the applicable year.

For purposes of determining Net Profit, each "**Year**" shall begin on the first day of the calendar month on or after the Closing, and on the same day of each succeeding calendar year, and shall conclude on last day of the twelfth month immediately thereafter.  Net Profit shall be determined in accordance with generally accepted accounting principles by the independent accountants then servicing Anvil Power.

(c)      **Payment of Net Profit; Audit Right.**  Within one hundred twenty (120) days after the end of each Year, Anvil Power shall deliver to Seller a calculation of Net Profit, if any, or if there is no Net Profit, a calculation of Anvil Power's net loss from the Assigned Contracts (a "**Net Profit Statement**"), for the immediately preceding Year together with payment of the applicable Profit Percentage. Seller shall have the right, during Anvil Power's regular business hours after not less than ten (10) business days' prior notice, to inspect books and records and all other documents and material, in whatever form, that are in the possession of or under the control of Buyers, Anvil Builders Inc., a California corporation ("**Anvil Builders**"), and any of Buyers' or Anvil Builders' Affiliates with respect to the calculation of Net Profit, including but not limited

Case: 25-10088   Doc# 322-1   Filed: 12/16/25   Entered: 12/16/25 17:38:29   Page 4 of 22

to all records relating to the job expenses, labor costs, equipment costs, and overhead, at the place or places where such records are normally retained by Buyers, Anvil Builders, or an Affiliate of Buyers or Anvil Builders, provided that Seller's inspection right with respect to the Net Profit reported on a Net Profit Statement shall terminate one year after the delivery to Seller of such Net Profit Statement. If such inspection reveals an underpayment of five percent (5%) or more of the amounts owed for the period being inspected or if the inspection results in a Net Profit of which Seller is entitled to a portion and no Profit Percentage was paid, Buyers shall reimburse Seller for its reasonable costs and expenses incurred in connection with such examination. Buyers shall immediately repay Seller the amount of any underpayment discovered plus interest at an annual rate of ten percent (10%) prorated by the number of days from the original payment date to the repayment date.

(i)      All books and records related to each Net Profit Statement shall be maintained and kept accessible and available to Seller for inspection for at least one (1) year after the date of delivery of the Net Profit Statement to Seller.

(ii)      If an investigation of Buyers', Anvil Builders', or Buyers' or Anvil Builders' Affiliate's books and records is made, certain confidential and proprietary business information of Buyers, Anvil Builders, or an Affiliate of Buyers or Anvil Builders may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by Seller and shall not be used by Seller or disclosed to any third party without the prior express written permission of Seller, unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on Buyers' underpayment of an applicable Profit Percentage pursuant to this Agreement or refusal to pay an applicable Profit Percentage.

(d)      The aggregate purchase price for the Anvil Equipment Purchased Assets (the "**Anvil Equipment Purchase Price**") shall be the value of the Anvil Equipment Purchased Assets as determined by Buyers and Seller after reviewing the Ritchie Brothers Auctioneers valuation and the FLV values set forth in the California Bank of Commerce valuation, provided that the Anvil Equipment Purchase Price shall not exceed thirty million dollars $30,000,000.

**Section 1.04    Payment of Purchase Price.**

(a)      Anvil Power shall pay the Anvil Power Fixed Component, which shall be reduced by the Accrued PTO Liability, in cash at closing, or Anvil Builders may pay all or any portion of the Anvil Power Purchase Price on behalf of Anvil Power by setting off all or any portion of the Anvil Power Purchase Price against the amount then owing by Seller to Anvil Builders pursuant to the Line of Credit and Security Agreement dated the date of this Agreement between Anvil Builders and Seller (the "**Line of Credit Agreement**").

(b)      Anvil Equipment shall pay the Anvil Equipment Purchase Price in cash at closing, or Anvil Builders may pay all or any portion of the Anvil Equipment Purchase Price on behalf of Anvil Power by setting off all or any portion of the Anvil Equipment Purchase Price against the amount then owing by Seller to Anvil Builders pursuant to the Line of Credit

Agreement (reduced by any reduction in the balance owing pursuant to paragraph (a) immediately above.

(c)     The cash portion of the purchase prices payable by Buyers shall be applied at the Closing in the following order and priority:

(i)     First, to fully satisfy the amount owing to any secured lender on any item of equipment purchased by Anvil Equipment;

(ii)     Second, to fully satisfy any payoff demand from California Bank of Commerce with respect to the assets that are acquired;

(iii)     Third, to satisfy any claims or liens for taxes (other than taxes not yet due and payable); and

(iv)     Fourth, to Seller.

**Section 1.05  Allocation of Purchase Price.** The Anvil Power Purchase Price and the Anvil Equipment Purchase Price (collectively, the "**Purchase Price**") and the Assumed Liabilities shall be allocated among the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets (collectively, the "**Purchased Assets**") for all purposes (including Tax and financial accounting) as shown on the allocation schedule to be agreed upon by the parties before the Closing and set forth on Exhibit 1.05 (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") in a manner consistent with the Allocation Schedule.

**Section 1.06  Existing Contracts**. Exhibit 1.06 lists certain material contracts of Seller (the "**Specified Contracts**").  If, at the end of the contracted work under each Specified Contract, (i) actual costs incurred following the Closing for any Specified Contract exceeds total revenue received following Closing under such Specified Contract and (ii) the Assigned Contracts as a whole have not been profitable in the period from Closing, then Seller shall reimburse Buyer for the amount that actual costs exceed total revenue on any such Specified Contract.

**Section 1.07  Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.08  Third-Party Consents.** To the extent that Seller's rights under any Purchased Asset may not be assigned to Buyers without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyers' rights under the Purchased Asset in question so that Buyers would not in

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyers' agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyers in any other reasonable arrangement designed to provide such benefits to Buyers.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Buyer or remotely by exchange of documents and signatures (or their electronic counterparts), (i) at 10:00 a.m. on July 3, 2023 or (ii) not less than not less than two days after the Conditions to Closing set forth in Article VI have been satisfied, whichever is later, or at such other time or place or in such other manner as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 2.02 Closing Deliverables.**

(a) At the Closing, Seller shall deliver to Buyer the following:

(i) a bill of sale (the "**Bill of Sale**") duly executed by Seller, transferring the Anvil Equipment Purchased Assets to Anvil Equipment;

(ii) an assignment and assumption agreement (the "**Assignment and Assumption Agreement**") and duly executed by Seller, effecting the assignment to and assumption by Anvil Power of the Anvil Power Purchased Assets and the Assumed Liabilities;

(iii) a certificate of the Secretary of Seller certifying as to (A) the resolutions of the board of directors and the shareholders of Seller, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, and the other agreements, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Transaction Documents**") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Transaction Documents; and

(iv) such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement.

(b) At the Closing, Buyers shall deliver to Seller the following:

(i) the purchase prices payable by Buyers determined pursuant to Section 1.03 (subject to Section 1.04(c));

Case: 25-10088   Doc# 322-1   Filed: 12/16/25   Entered: 12/16/25 17:38:29   Page 7 of 22

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

(ii)    the Assignment and Assumption Agreement duly executed by Anvil Power; and

(iii)    Certificates of the Secretary (or equivalent officer) of Buyers certifying as to (A) the resolutions of the boards of directors of Buyers, which authorize the execution, delivery, and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Buyers authorized to sign this Agreement and the other Transaction Documents.

(c)    At the Closing, Richard Kingsborough and Anvil Power shall enter into an Employment Agreement having a five (5) year term, subject to early termination for cause.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Seller Parties jointly and severally represent and warrant to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01  Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, and shareholder action on the part of Seller. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.  Shareholders own all of the issued and outstanding shares of capital stock of Seller, free and clear of any liens, encumbrances or options.

**Section 3.02  No Conflicts or Consents.** The execution, delivery, and performance by Seller Parties of this Agreement and the other Transaction Documents to which they are a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets; (c) require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create

7

in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

Section 3.03 **Undisclosed Liabilities.** Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet of Seller as of February 28, 2023 (the "**Balance Sheet Date**"), and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

Section 3.04 **Assigned Contracts.** Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Neither Seller nor, to Seller's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. No event or circumstance has occurred that would constitute an event of default under any Assigned Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or threatened under any Assigned Contract.

Section 3.05 **Title to Purchased Assets.** Seller has good and valid title to all the Purchased Assets, free and clear of Encumbrances, other than (a) the security interest held by California Bank of Commerce, and (b) security interests held by lenders in specific items of equipment included in the Anvil Equipment Purchased Assets.

Section 3.06 **Condition of Assets.** Each item of the Anvil Equipment Purchased Assets is in good operating condition and repair, and is adequate for the uses to which it is being put, and no item of the Anvil Equipment Purchased Assets is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost."

Section 3.07 **Legal Proceedings; Governmental Orders.**

(a) There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "**Actions**") pending or, to Seller's knowledge, threatened against or by Seller: (i) relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b) There are no outstanding Governmental Orders against, relating to, or affecting the Business or the Purchased Assets.

**Section 3.08   Compliance with Laws.** Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

**Section 3.09   Taxes.** All Taxes due and owing by Seller have been, or will be, timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller. All Tax Returns required to be filed by Seller for any tax periods prior to Closing have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete, and correct in all respects. The term "**Taxes**" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property (real or personal), customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto.

**Section 3.10   Brokers.** Except for Baserock Partners, no broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.11   Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of California. Buyer has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02  No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the articles of incorporation, bylaws, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03  Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.04  Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 4.05  Buyer Investigation.** Buyer acknowledges and agrees that in no event shall Seller have any liability to Buyer with respect to the breach of any representation, warranty, or covenant in this Agreement to the extent Buyer knew of such breach as of the Closing or Closing Date.

**ARTICLE V**
**COVENANTS**

**Section 5.01  Confidentiality.** From and after the Closing, Seller Parties shall, and shall cause their Affiliates to, hold, and shall use their reasonable best efforts to cause their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Seller Parties or any of their Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02  Employees.**

10

(a)     Upon the Closing, Anvil Power and/or an Affiliate of Anvil Power shall offer employment to substantially all of Seller's employees for substantially the same pay, benefits and positions.  Seller shall cooperate with Anvil Power's recruitment of Seller's employees.

(b)     After the Closing, neither Anvil Power nor any Affiliate shall terminate 50 or more employees or change their compensation, benefits (including retirement plans, health insurance, vacation and sick days), level of seniority, working conditions or job responsibilities within thirty (30) days after Closing.

**Section 5.03  Real Property.**  Effective as of the Closing, Anvil Power and Anvil Equipment shall sublease or license some of the real property occupied by Seller on a month-to-month basis at rates equal to the per square foot rental rates paid by Seller on properties not owned by Shareholders, and fair market value on properties owned by Shareholders (to be negotiated) for a period not to exceed ninety (90) days. Thereafter, Anvil Power and/or Anvil Equipment intend to lease or sublease certain real property presently occupied by Seller on a longer term basis after a review of their post-closing operations and anticipated needs; provided that neither Anvil Power nor Anvil Equipment shall be required to lease or sublease any such property after the ninety (90) day period after the Closing has elapsed. The parties intend that for properties owned by Shareholders, the terms of such leases or subleases will be based on their current fair market value (to be negotiated) for a period of up to 5 years and include an option to renew such leases or subleases for a period of up to 5 years at their then fair market value or agreed upon escalation percentage.  During the ninety (90) day period after the Closing, Anvil Power shall have a right of first refusal with respect to the sublease or assignment of each lease.

**Section 5.04  Conduct of Business.**  Until the Closing, Seller shall conduct its business diligently and in substantially the same manner as it has previously been carried out.

**Section 5.05  Public Announcements.**  Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.06  Receivables.**  From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any services rendered by Anvil Power or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Anvil Power within five (5) business days after its receipt thereof. From and after the Closing, if either Buyer or its Affiliate receives or collects any funds relating to any services rendered by Seller, Buyer or its Affiliate shall remit any such funds to Seller within five (5) business days after its receipt thereof.

**Section 5.07  Transfer Taxes.**  All sales, use, registration, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents, if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

**Section 5.08  Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**Section 5.09  Third Party Consents.** Each party agrees to cooperate with the others in connection with the transition of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets from Seller to Buyers and the assumption of the Assigned Contracts, including without limitation obtaining consents, authorizations, orders and approvals in writing from Pacific Gas & Electric that are required to assign the PG&E Contracts to Anvil Power, in each case, in form and substance reasonably satisfactory to Anvil Power and Seller and obtaining any releases of any guaranties associated with the Assigned Contracts. The parties will cooperate with the notification of third parties of Buyers' acquisition of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets or assumption of the Assigned Contracts and will further cooperate with obtaining all applicable third-party consents and approvals, and release of any personal guaranties associated with the Assigned Contracts (provided that no such release shall be a condition to Closing).  To the extent that Seller's rights under any of the Anvil Power Purchased Assets and the Anvil Equipment Purchased Assets may not be assigned to Buyers without the consent of another Person which has not been obtained as of Closing (a "**Restricted Asset**"), this Agreement shall not constitute an agreement to sell, assign, transfer or deliver the Restricted Asset. Following Closing, Seller shall use commercially reasonable efforts, and cooperate with Buyers' requests, to obtain the Consent(s) relating to each Restricted Asset as soon as practicable.  Pending the obtaining of such Consents relating to any Restricted Asset, the parties shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Buyers the benefits of use of such Restricted Asset (or any right or benefit arising thereunder, including the enforcement for the benefit of Buyers of any and all rights of the applicable Seller against a third party thereunder). Once any necessary Consent to the sale, conveyance, assignment, transfer and delivery of a particular Restricted Asset is obtained, the Restricted Asset shall then be deemed to be a Purchased Asset.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.01  Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)  No governmental authority shall have enacted, issued, promulgated, enforced or entered any governmental order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

12

(b)     California Bank of Commerce shall have delivered a written payoff demand providing for the release of its security interest in the Anvil Equipment Purchased Assets upon receipt of a cash payment.

(c)     Buyers shall be satisfied, in their sole discretion, with their due diligence investigation of Seller and the assets to be acquired by Buyers pursuant to this Agreement.

(d)     The parties shall have agreed to the valuation of the Anvil Equipment Purchased Assets, which shall not exceed the specific amount set forth in Section 1.03(d).

**Section 6.02   Conditions to Obligations of Buyer.**   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Seller contained in Section 3.01, Section 3.02, and Section 3.10, the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality) or in all material respects (in the case of any representation or warranty not qualified by materiality) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Seller contained in Section 3.01, Section 3.02, and Section 3.10 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(e)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 6.03 Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a) Other than the representations and warranties of Buyer contained in Section 4.01 and Section 4.02, the representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or material adverse effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Buyer contained in Section 4.01 and Section 4.02 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b) Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c) No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d) Buyers and Seller agree on the purchase price for the Anvil Equipment Purchased Assets, which shall not exceed the specific amount set forth in Section 1.03(d).

## ARTICLE VII
## INDEMNIFICATION

**Section 7.01 Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing.

**Section 7.02 Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VIII, from and after Closing, Seller shall indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees (collectively, "**Losses**"), incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, or with respect to:

(a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such

14

representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto;

(c)     any asset of Seller that is not acquired by Buyers pursuant to this Agreement or any Liability of Seller that is not assumed by Buyers pursuant to this Agreement; or

(d)     any Third-Party Claim based upon, resulting from, or arising out of the business, operations, properties, assets, or obligations of Seller or any of its Affiliates conducted, existing, or arising on or prior to the Closing Date. For purposes of this Agreement, "**Third-Party Claim**" means notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

**Section 7.03 Indemnification Basket**.  Seller shall not be liable to the Buyer Indemnitees for indemnification under Section 7.02 until the aggregate amount of all Losses in respect of indemnification under Section 7.02 exceeds $50,000 (the "***Basket***"), in which event Seller shall be required to pay or be liable for all such Losses that exceed the Basket.

**Section 7.04    Indemnification Cap.**  In no event shall the aggregate amount of Losses for which the Buyer Indemnities shall be entitled to indemnification under this ARTICLE VII shall exceed the sum of (i) the Anvil Power Fixed Component, (ii) the Profit Percentage payments, and the Anvil Equipment Purchase Price less debt owed by Seller on the equipment sold to Buyer.

**Section 7.05 Indemnification by Buyer.**  Subject to the other terms and conditions of this ARTICLE VII, from and after Closing, Buyer shall indemnify and defend each of Seller and its Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement; or

(c)     any Assumed Liability.

**Section 7.06 Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"). In connection with any claim giving rise to indemnity hereunder resulting from or arising out of any Action by a Person who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed).

**Section 7.07 Cumulative Remedies.** The rights and remedies provided in this ARTICLE VII are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**ARTICLE VIII**
**MISCELLANEOUS**

**Section 8.01 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses; *provided, however*, Seller shall pay all amounts payable to Baserock Partners.

**Section 8.02 Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

**If to Seller:**       Mr. Richard Kingsborough
Ms. Cindy Kingsborough
Kingsborough Atlas Tree Surgery, Inc.
1544 Ludwig Avenue
Santa Rosa, CA 95407

16

Email: rich@atlas-tree.com

**If to Buyer:**     Mr. Alan C. Guy
Anvil Builders Inc
1550 Park Avenue
Emeryville, CA 94608
Email: alan@anvilbuilders.com

**Section 8.03  Interpretation; Headings.**  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.04   Severability.**  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 8.05   Entire Agreement.**  This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents.

**Section 8.06   Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.07  Amendment and Modification; Waiver.**  This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 8.08  Governing Law.**  All matters arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

**Section 8.09  Arbitration.**  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Alameda County, California before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

**Section 8.10  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Signatures on following page*]

18

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

KINGSBOROUGH ATLAS TREE SURGERY, INC.
a California corporation

By _____
    Richard Kingsborough
    Chief Executive Officer

_____
RICHARD KINGSBOROUGH, individually

_____
CINDY KINGSBOROUGH, individually

ANVIL BUILDERS INC
a California corporation

By _____
    Alan C. Guy
    Chief Executive Officer

19

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# EXHIBIT A

Ex A

DocuSign Envelope ID: 96DDC66D-5F1E-4EC9-895C-977A1AA40A6A

# EXHIBIT 1.05
# PURCHASE PRICE ALLOCATION